IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL DAVID JOLLEY                                                      PLAINTIFF

v.                    Civil No. 09-5084

DR. HUSKINS, Jail Doctor,
Benton County Detention Center;
DEPUTY McCRANNIE, Benton
County Detention Center; DEPUTY
MORRISON, Benton County
Detention Center; DEPUTY
LEESE, Benton County Detention
Center; and DEPUTY TUCKER,
Benton County Detention Center                                      DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff, Michael David Jolley (hereinafter Jolley), filed this civil rights action pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Jolley is currently incarcerated in the Cummins Unit of the Arkansas Department of Correction. The events at issue in this case occurred while he was incarcerated at the Benton County Detention Center (BCDC). Jolley maintains his constitutional rights were violated in the following ways: (1) he was denied adequate medical care; (2) he was subjected to verbal abuse; (3) his grievances went unanswered; (4) Defendants Morrison and Leese mixed shampoo in with his food; (5) he was denied an adequate diet; (6) he was retaliated against; (7) his legal mail was interfered with; and (8) excessive force was used against him.

A motion for summary judgment has been filed on behalf of Defendants (Doc. 40). To assist Jolley in responding to the summary judgment motion, I propounded a questionnaire (Doc. 46). Jolley filed a timely response to the questionnaire (Doc. 47). The motion is now ready for decision.

## I. Background

Jolly was booked into the BCDC on February 11, 2009, on a pending criminal charge. *Plaintiff's Response* (Doc. 47)(hereinafter *Resp.*) at ¶ 1. On August 7, 2009, he was sentenced to a period of incarceration in the ADC. *Id.* at ¶ 3. He was released from the BCDC on December 15, 2009, and transferred to the ADC.

When he was booked into the BCDC on February 11th, he completed a medical questionnaire. *Resp.* at ¶ 4. He indicated he had a bad back and bad ankles. *Id.* He listed no other problems or conditions. *Id.*

On February 12th, he submitted a medical request because his teeth were hurting. *Resp.* at ¶ 5(A). He was seen by Dr. Huskins[1] on February 13th. *Id.* at ¶ 5(B). Jolley was prescribed Tylenol. *Id.* at ¶ 5(C).

On February 15th, Jolley submitted a medical request complaining of back pain. *Resp.* at ¶ 6(A). He believes he was given Tylenol and Aleve. *Id.* at ¶ 6(B).

On February 16th, Jolley complained of tooth pain. *Resp.* at ¶ 7(A). In response, the nurse ordered Tylenol. *Id.* at ¶ 7(B).

On February 18th, Jolley asked to see the doctor about his back. *Resp.* at ¶ 8(A). He submitted a second request on February 19th. *Id.* at ¶ 8(B). He was seen by Dr. Huskins on February 20th and prescribed Tylenol for one week. *Id.* at ¶ 8(C). Jolley indicates he is not sure what was wrong with his back. *Id.* at ¶ 8(D). Prior to his incarceration, he was not undergoing any treatment for his back. *Id.* at ¶ 8(E).

On February 23rd, Jolley submitted a request to see the doctor about his teeth. *Resp.* at ¶ 9(A). He was seen by Dr. Huskins on February 25th and prescribed saline rinses and Tylenol. *Id.*

---

[1] At some places in the summary judgment questionnaire, the jail doctor was erroneously referred to as Dr. Mullins.

at ¶ 9(B). He was seen by Dr. Huskins again on February 27th for back and dental problems. *Id.* at ¶ 10. Jolley was prescribed Tylenol. *Id.*

On March 5th, Jolley asked to see the doctor about his teeth. *Resp.* at ¶ 11(A). On March 7th, he submitted another request to see the doctor about his teeth. *Id.* at ¶ 11(B). He said they were hurting. *Id.* On March 9th, he was seen by Dr. Huskins and a soft tray was ordered. *Id.* at ¶ 11(C). Neither Dr. Huskins nor the nurse mentioned sending Jolley to a dentist. *Id.* at ¶ 11(E). Jolley indicates he later discovered he had a rotten tooth, a couple of wisdom teeth, and some cavities that needed attention. *Id.* at ¶ 11(D).

Jolley continued to submit medical requests to see the doctor about his teeth and back. He made the following requests and received the following response:

-March 10th, tooth pain; in response told he had seen the doctor the day before;

-March 11th, tooth pain; seen by Dr. Huskins for dental complaints and complaints of back pain, prescribed Tylenol;

-March 18th, tooth pain; seen by Dr. Huskins on March 20th and prescribed saline rinses and Tylenol;

-March 23rd, back and teeth; seen by Dr. Huskins and prescribed Tylenol and saline rinses;

-March 27th, teeth;

-March 28th, back pain;

-March 30th, back pain;

-March 31st, back pain; seen that day for back and dental pain and prescribed Aleve;

-April 2nd, back pain; in response, told he had been seen on March 31st and prescribed ten days of Aleve;

-April 2nd, teeth; seen by Dr. Huskins on April 7th for complaints of back and dental problems and prescribed Motrin and saline rinses for seven days;

-April 9th, submitted a medical request complaining it hurt his teeth to eat the cereal that

was served at breakfast although he was on a soft diet; in response, the nurse stated that medical could only order a soft diet but had no control over the menu. She asked if Jolley had tried to let the milk soften the cereal before he ate it;

-April 9th, teeth hurting and bleeding;

-April 12th, requesting a refill of his Ibuprofen prescription; seen by Dr. Huskins on April 13th and prescribed Motrin for his teeth and Vaseline for his lips;

-April 15th, teeth are bleeding and the Ibuprofen was not helping;

-April 17th, seen by Dr. Huskins prescribed Tylenol;

-April 28th, requested a refill of his Ibuprofen prescription for his teeth; the request was approved;

-May 6th, seen by the nurse for teeth and back pain and prescribed Tylenol;

-May 24th, teeth and back pain;

-June 3rd, teeth hurting and bleeding; seen June 5th and prescribed Tylenol;

-June 15th, seeking renewal of Tylenol for teeth;

-June 18th, tooth pain need Tylenol renewed;

-June 20th, tooth pain need Tylenol renewed;

-June 22nd, tooth pain need Tylenol renewed;

-June 23rd, seen by a dentist who recommended pulling the wisdom tooth on the left side; seen by medical personnel and his Tylenol prescription was renewed;[2]

-June 28th, Tylenol renewal;

-June 30th, requesting two tablets of Tylenol three times a day instead of one tablet three times a day;

-July 6th, tooth pain need Tylenol renewed;

---

[2] The only information about this visit to the dentist is in a medical request Jolley submitted on June 23rd. *Defts' Ex.* 3(B) at pg. 16. Jolly says: "I went to the dentist today. He recommends getting my wisdom tooth on the left side pulled. Is that something we need to get [ADC] approval on? Can you please let me know?" No mention of this dental appointment is contained within the jail medical chart maintained by the jail doctor and nurse. *See Defts' Ex.* 2(B). No records have been submitted from a dentist.

-4-

-July 15th, tooth pain need Tylenol renewal;

-July 22nd, tooth pain need Tylenol renewed;

-July 28th, loose tooth cutting into the gum; seen on July 29th and prescribed saline rinses;

-July 30th, two requests submitted: tooth pain need Tylenol renewed; seen on July 31st and doctor noted "no problem" and "dental unchanged;"

-August 2nd, need renewal of salt water rinse;

-August 8th, tooth pain need Tylenol renewed;

-August 10th, tooth pain need Tylenol renewed;

-August 19th, tooth pain need Tylenol renewed;

-August 27th, tooth pain need Tylenol renewed;

-September 2nd, tooth pain need Tylenol renewed and questioned being switched back to only one tablet of Tylenol;

-September 4th, seen for complaints of dental pain and stress and prescribed Tylenol and Trazodone;

-September 5th, complaining the Tylenol dosage had been lowered and he was in excruciating pain and couldn't get to the dentist;

-September 6th, need to see doctor about teeth; seen September 6th and prescribed two Tylenol, three times a day;

-September 21st, tooth pain and need Tylenol renewed;

-September 22nd, back pain; seen by the doctor on September 25th and prescribed Trazodone, Tylenol, and Aleve;

-September 27th, requested Aleve three times a day; in response told Aleve could only be taken twice a day but he could switch back to Tylenol;

-September 28th, asked to be switched back to Tylenol;

-October 2nd, back pain; seen on October 5th and prescribed Aleve and Tylenol;

-October 8th, need to see doctor about teeth; seen on October 9th and a health services request form was sent to the ADC on October 12th asking for permission for a dental

AO72A
(Rev. 8/82)

consult;

-October 13th, tooth and back pain need refills on Tylenol and Aleve; permission from the ADC received for Jolley to be seen by a local dentist for emergency treatment of pain. Authorization covered antibiotics, simple fillings, or extraction;

-October 23rd, seen by Dr. Harrington, a dentist, one filling done and recommended extraction of lower left wisdom tooth;

-October 26th, ADC approval given for extraction and seen by Dr. Huskins who prescribed saline rinses and Tylenol;

-October 30th, need treatment for back;

-November 6th, seen by Dr. Harrington and wisdom tooth extracted;

-November 8th, still having tooth pain; seen on November 9th and prescribed saline rinses and Tylenol;

-November 14th, still in pain from wisdom tooth extraction; seen on November 16th and prescribed saline rinses and Tylenol;

-November 21st, renewal for salt water rinses requested;

-November 22nd, renewal of Tylenol and Aleve needed for tooth and back pain;

-December 5th, renewal of Tylenol and Aleve for tooth and back pain;

-December 7th, asking why Tylenol and Aleve were cut back; and

-December 9th, asking to get on the former dose of Tylenol and Aleve; and

-December 10th, back pain; seen on December 11th and prescribed a regular diet and Aleve.

Jolley states he received very little relief from the saline rinses and the Tylenol. *Resp.* at ¶ 14(C). He indicates his mouth still hurt and the Tylenol did nothing for his back. *Id.* Jolly also submitted a number of requests or grievances about the cereal he was served with breakfast being too hard and hurting his teeth to eat it. *Resp.* at ¶¶ 19(A)(April 9th), 21(C)(April 13th), 22(C)(April 16th); *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 3(A) at pgs. 24(April 17th), 25(April 18th),

-6-

26(April 20th); *Defts' Ex.* 4(A) at pg. 5(April 19th). In response, he was told the menu was set by the dietician and there was no substitution for cereal. *Resp.* at ¶ 23(B).

Jolley submitted medical requests to be treated for stress and depression and was initially prescribed Paxil but that was later changed to Inderal and then to Trazodone. *Resp.* at ¶¶ 24(A), 29, 40(A); *Defts' Ex.* 2(B) at pgs. 10-11. He also submitted requests due to stomach upset issues and was prescribed an antacid. *Resp.* at ¶¶ 26(C), 26(G), He submitted requests about a lump on his chest and one on his left nipple. *Resp.* at ¶¶ 41(A) & 41(B); *Defts' Ex.* 2(B) at pg. 9. Jolley was seen and prescribed medication. *Id.*

Jolley received all medication prescribed to him while he was at the BCDC. *Resp.* at ¶ 61(A). Jolley was asked to describe in detail how Dr. Huskins exhibited deliberate indifference to his serious medical or dental needs. Jolley responded that it took from February to October and "being sentenced to [the] ADC to get me to the dentist." *Id.* at ¶ 62. He indicates he was in pain during those months and the only pain relief given was Tylenol or Aleve. *Id.; see also Resp.* at ¶ 69. Jolley indicates his teeth still bother him when he drinks anything cold and he gets frequent headaches. *Id.* at ¶ 69.

On March 16th, during a shake down, Deputy Morrison found a piece of plastic wrap concealed under Jolley's bunk. *Resp.* at ¶ 33(A). Jolley was charged with an infraction for having an item he was not authorized to have. *Id.* Jolley received a disciplinary hearing, was found guilty, and was locked down for ten days. *Id.* at ¶ 33(B).

On April 4th, Jolley asserts that Deputy Morrison and Deputy Leese mixed shampoo in with the salsa and served it to him. *Resp.* at ¶ 63(A). Jolley indicates he knew this is what happened because the deputies were in pod control talking about it and laughing. *Id.* As a result, Jolley maintains he had an upset stomach and was throwing up. *Id.* at ¶ 63(B). He maintains he submitted

a grievance about the incident but never received it back. *Id.* at ¶ 63(C).

On May 7th, Jolley submitted a grievance complaining he had received one of his legal letters back because it was counted as a personal letter. *Resp.* at ¶ 27(A). Other than this one time, he was able to send and receive both legal and personal mail. *Id.* at ¶ 27(B).

On May 27th, Jolley asked why he never got the grievances he made about deputies back. *Resp.* at ¶ 32(A). In response, he was told that if he thought this was an issue he should ask to speak to the shift sergeant and personally hand the grievances to him. *Id.* While Jolley followed this suggestion, he maintains there were still times the grievances did not get answered or returned. *Id.* at ¶ 32(B).

On June 1st, Morrison observed Jolley eating off another person's tray. *Resp.* at ¶ 33(C). Jolley was informed that he would be charged with a disciplinary violation and be put in disciplinary segregation for thirty days. *Id.* Jolly was charged with stealing, had a disciplinary hearing, and was found guilty and given thirty days lock-down. *Id.* at ¶ 33(D). He appealed and the ruling was upheld. *Id.* at ¶ 33(E).

Jolley submitted a grievance dated June 2nd. *Resp.* at ¶ 33(F). He said he had not been stealing food. *Id.* In response, Captain Holly said he had personally observed Jolley doing it but he would look at the amount of time Jolley was given in lock down. *Id.* Captain Holly reduced Jolley's lock down time to ten days. *Id.* at ¶ 33(G).

On June 6th, Jolley submitted a grievance stating he had been pulled out during lunch by Morrison. *Resp.* at ¶ 35(A). Jolley stated he was pushed against the wall by Deputy Tucker who said he could continue his lawsuit in E-pod. *Id.* Jolley maintains Tucker used excessive force in pushing him against the wall. *Id.* at ¶ 35(B).

On June 6th, Jolley submitted a second grievance complaining that while Deputy King was

taking mats he had Jolley against the wall patting him down. *Resp.* at ¶ 35(D). Jolley indicated he was pushed against the wall and King said: "Now I really get to mess with you." *Id.* Jolley said he didn't know if this had occurred as a result of his lawsuit or because he came from D-149. *Id.* Captain Holly responded saying no one was referring to Jolley's lawsuit. *Id.* at ¶ 35(E).

On September 21st, Jolley complained that Deputy Cordeiro tried to give him someone else's medication and that he only gave Jolley one Tylenol instead of two. *Resp.* at ¶ 45(F). In response, he was told deputies were human and made mistakes. *Id.* at ¶ 45(G). He was told he was "definitely" in the right to point out the error. *Id.*

On October 1st, Jolley complained that Deputy Norton tried to give him expired medication, Aleve. *Resp.* at ¶ 35(H). Jolley was asked to state what he meant by "expired." In response, he indicates the medication card showed a stop date for Aleve that was before October 1st. *Id.*

Jolley indicates there were three times when he was given the wrong medication. The first time involved Deputy Cordeiro; the second time involved Deputy Norton; and the third time involved Deputy King. *Resp.* at ¶ 45(I). Jolley indicates he only took the wrong medication one time. *Id.* This was when King gave him the wrong medication. *Id.* As a result, Jolley broke out in a rash. *Id.* Jolley maintains medication should be distributed by a licensed nurse. *Id.* at pg. 74.

With respect to Deputy McCrannie, Jolley asserts he opened Jolley's legal mail when he was not present. *Resp.* at ¶ 65. Jolley indicates the legal mail pertained to his civil suit. *Id.*

## II. Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, the nonmoving party may

not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986).

### III. Discussion

Defendants have now moved for summary judgment. First, defendants argue that the case must be construed to be against them in their official capacities only because plaintiff did not indicate in the complaint that he was asserting individual capacity claims against them. As there is no proof of an unconstitutional custom or policy, defendants maintain they are entitled to judgment as a matter of law. Second, defendants argue that plaintiff was not denied adequate medical or dental care. Third, they maintain verbal abuse does not rise to the level of a constitutional violation. Fourth, they argue that there is no constitutionally protected right to answered grievances or to a grievance procedure. Fifth, they argue that an isolated practical joke fails to rise to the level of a constitutional violation. Sixth, they maintain Jolley was provided with an adequate diet. Seventh, they maintain there was no retaliation against Jolly. Eighth, they maintain there was no interference with his legal mail. Ninth, they maintain no excessive force was used against Jolley. Finally, defendants maintain they are entitled to judgment as a matter of law because plaintiff has suffered no actual physical injury. We will address each claim in turn.

*Official Capacity and Individual Capacity Claims*

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those
> in their official capacities as to the type of conduct that is actionable and as to the

-10-

> type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989); *see also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers, specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity"); *Egerdahl v. Hibbing Comm. Coll.*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

The distinctions between individual and official capacities claims are at times difficult for even those with legal training to make. *See e.g., Vanhorn v. Oelschlager*, 502 F.3d 775, 779

-11-

(8th Cir. 2007)(state officials misconstrue the distinctions between official and individual capacity claims and the immunities available). Given the duty of the court to liberally construe *pro se* pleadings and the fact that it does not appear defendants will be unfairly prejudiced in anyway, we will construe the complaint as asserting both official capacity and individual capacity claims against the defendants.

### *Denial of Adequate Medical Care*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, plaintiff must prove that defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Med. Servs*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, plaintiff concedes he was seen numerous times by Dr. Huskins. However, he asserts he was never given anything for his dental pain other than salt water rinses and Tylenol. While this provided some minor relief from pain, he indicates the pain at times was

-12-

AO72A
(Rev. 8/82)

excruciating and that he had difficulty eating the items served at the detention center because of his dental condition. He also maintains he received nothing for his back except Tylenol or Aleve. According to Jolley, it wasn't until after he was convicted and sentenced to a period of incarceration at the ADC that he actually received dental care.

As mentioned above, the only reference to Jolley receiving dental care prior to that is one made by Jolley in a medical request he filled out. *Resp.* at ¶ 36(A). Jolley does not know who he saw or if he was given any treatment. *Id.* at ¶¶ 36(C)-36(D). There is nothing in the medical records indicating Jolley was sent to a dentist on this day. *Id.* He was seen by medical personnel and given another prescription for Tylenol for his toothache. *Id.* at ¶ 36(B).

Defendants maintain that Jolley was seen forty times and prescribed medication which he received. Defendants also note that Jolley was twice seen by Dr. Harrington.

In this case, there is no evidence in the jail medical records suggesting medical staff even considered sending Jolley to dentist until after he was sentenced to the ADC and it approved dental treatment for Jolley. Jolley complained repeatedly about dental pain, indicated the Tylenol and/or Aleve were inadequate in providing pain relief, and stated he was unable to eat certain foods contained on the "soft tray" because of his dental problems . There is no indication that other pain medications, narcotic or not, were considered. Nothing in the record suggests medical personnel considered plaintiff's complaints of pain to be exaggerated or not supported by his dental condition. Plaintiff also complained that he was given the wrong medication by deputies on several occasions. This calls into question the method of medication distribution and the training provided.

In this case, there are genuine issues of fact as to whether Dr. Huskins exhibited deliberate indifference to Jolley's serious medical or dental needs. Cases have found that even

-13-

"[a] three-week delay in dental care, coupled with knowledge of the inmate-patient's suffering, can support a finding of an Eighth Amendment violation." *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995). In this case, Jolley waited from February until October to be seen by a dentist.

### *Verbal Abuse*

Jolley maintains he was verbally abused by guards, laughed at, and told by Deputy McCrannie that no one cared if a child molester died. "Verbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985). Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim). *Cf. Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986)(A claim was stated where the prisoner alleged "that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death.").

### *Inadequate Grievance Procedure*

Jolley contends his grievances were not handled properly, he did not always get responses, and he did not get copies of the grievances he did submit. Jolley was able to submit grievances and medical requests. While most of his grievances and requests received a written

-14-

response, Jolley indicates some were not returned to him.

However, Jolley has not identified a federal constitutional right that he was deprived of because of the alleged inadequacies in the grievance procedures. He makes no argument that he was treated differently from other similarly situated prisoners, or his grievances were ignored because of his exercise of his constitutional rights, or his ability to exercise any specific constitutional right was chilled by defendants' actions.

"Inmates do not have a constitutionally protected right to a grievance procedure. Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . . grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted). *See also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (*citing Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)). A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." Id. (citation omitted). "[A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005).

### *Practical Joke*

According to Jolley, on April 4th, Deputies Morrison and Leese put shampoo in his food. Jolley maintains he was sick following this incident and his stomach was burning. Defendants

-15-

maintain no such incident occurred. If the incident did occur, they maintain it would not violate Jolley's constitutional rights without a showing of an actual physical injury. They maintain Jolley's allegation that he was temporarily sick as a result of the ingestion of the shampoo does not constitute an actual physical injury. Instead, they maintain Jolley suffered at most a non-actionable *de minimis* injury. The record does not contain an incident report or the affidavits of Morrison or Leese.

Jolley's allegation is essentially that Morrison and Leese with malicious intent exposed him to harm without a penological purpose. *Cf. Williams v. Jackson*, 600 F.3d 1007, 1013-1014 (8th Cir. 2010)(jail personnel in response to inmate comments removed the shield from an germicidal ultraviolet radiation lamp used for the treatment of tuberculosis). The resulting injury is not a threshold requirement in proving an Eighth Amendment violation. *Wilkins v. Gaddy*, ___ U.S. ____, 130 S. Ct. 1175, 1177-78 (2010)(a claim may not be dismissed solely on the *de minimis* nature of the resulting injury). In this case, there are clearly factual issues as to whether these deputies acted as alleged by Jolley.[3]

Defendants also maintain this claim must be dismissed because Jolley submitted no grievance regarding it. Jolley, however, asserts he did submit grievances regarding this issue but did not get any copies back. Clearly, there is an issue of fact as to whether Jolley exhausted his administrative remedies.

### *Adequate Diet*

Although Jolley states he was not able to eat all the food included in the soft diet, he was provided a soft diet on his request and later changed to a vegetarian diet at his request. He makes

---

[3] I note there is at least one other case pending in this district in which the same or similiar allegations were made against these two defendants. *See Andrews v. Morrison, et al.,* Civil No. 09-5080.

-16-

no argument that he did not receive a diet adequate to maintain his health. This is all the constitution requires. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(prisoners have a right to nutritionally adequate food); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet).

### *Retaliation*

In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)(citation omitted); *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)(same). "Indeed, the retaliatory conduct does not itself need to be a constitutional violation in order to be actionable." *Id.* *See also Dixon v. Brown*, 38 F.3d 379, 380 (8th Cir. 1994)("[W]hen retaliatory conduct is involved, there is no independent injury requirement.").

To prevail on his retaliation claim, Jolley must demonstrate: (1) that he engaged in protected activity; (2) that the defendants in response took adverse action; and (3) that his protected activity was the cause of the retaliation. *See Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994)(threat of retaliation is sufficient injury if made in retaliation for inmate's use of prison grievance procedure). "To avoid summary judgment, [Jolley] must submit affirmative evidence [of] retaliatory motive." *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) *Id.* (internal quotation marks and citation omitted).

Jolley maintains he was retaliated against on June 6th when he was moved from D-pod to E-pod. He asserts he was pushed against the wall by Tucker and told he could continue his lawsuit in E-pod. *Resp.* at ¶ 35(A). Once there, Jolley asserts Deputy King retaliated against him by

pushing him up against the wall and saying: "Now I really get to mess with you." *Id.* at ¶ 35(D). Jolley feels this occurred because of his lawsuit. *Id.* at ¶ 35(F). Jolley has presented no affirmative evidence of retaliatory motive. Defendants are therefore entitled to summary judgment on this claim.

### *Interference with Legal Mail*

Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). In this case, Jolley's claim is based on a single incident when his legal mail was opened when he was not present. *Resp.* at ¶ 27(A) & ¶ 27(B). An isolated incident during which an inmate's incoming legal mail is opened, "without evidence of improper motive or resulting interference with the inmate's right to counsel or access to the courts, does not give rise to a constitutional violation." *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997)(internal quotation marks and citation omitted).

### *Excessive Force*

At the time of the alleged use of excessive force, Jolley was a pretrial detainee. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

-18-

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, the alleged use of force occurred on June 6th. *Resp.* at ¶ 35(A). Jolley indicates he was pulled out of the pod during lunch by Morrison, told to get against the wall by Morrison, and then pushed against the wall by Tucker. *Id.* at ¶¶ 35(A) & 35(C). No other force is alleged to have been used. Jolley does not allege he suffered any injury as a result of the use of force. There is nothing in the record to indicate Morrison or Tucker used more force than was reasonably believed to be necessary in light of the facts and circumstances existing at the time. There are no genuine issues of fact as to whether the force used was excessive.

### *Physical Injury Requirement*

Defendants maintain they should be granted judgment as a matter of law because Jolley suffered no physical injuries as required by the Prison Litigation Reform Act (PLRA). Codified as 42 U.S.C. § 1997e(e), section 803(d) of the PLRA provides as follows: "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for

-19-

AO72A
(Rev. 8/82)

mental or emotional injury suffered while in custody without a prior showing of physical injury."

The provision limits the available damages in the absence of a physical injury but does not preclude a plaintiff from pursuing a claim. *See Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004)(The physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners" but does not bar the recovery of nominal and punitive damages); *see also Pool v. Sebastian County*, 418 F.3d 934, 942 n.2 (8th Cir. 2005)(Section 1997e(e) presents an issue of damages under the PLRA). As several of Jolley's claims will proceed, we decline at this point to attempt to determine whether his claimed injuries of pain caused by the condition of his teeth, his back, and as a result of the ingestion of shampoo are sufficient to enable him to recover damages for his mental pain and suffering under § 1997e(e).

### IV. Conclusion

For the reasons stated, the motion for summary judgment (Doc. 40) will be granted in part and denied in part. Specifically, it will be granted with respect to the verbal abuse claim, the inadequate grievance procedure claim, the inadequate diet claim, the retaliation claim, and the excessive force claim. A separate order in accordance with this opinion will be entered.

DATED this 17th day of March 2011.

/s/ *J. Marschewski*
 HON. JAMES R. MARSCHEWSKI
 CHIEF UNITED STATES MAGISTRATE JUDGE